is the case of in re Marriage of Burris. And we have Mr. Michael Burke. And we have Ms. Jessica Beatty for the athlete. And you may proceed when you're prepared to Ms. Burke. Thank you. Thank you. Thank you. Well. Mm hmm. Good morning. May it please the court counsel. My name is Michael Burke and I represent the respondent appellant in this case David Burris on this matter. The respondent became the appellant when the trial court ruled against him and ruled against the manifesto later the evidence and found that the petitioner appellee, Ms. Pam Burris, was not cohabiting with a Mr. Patton on a resident continuing conjugal basis and granted her maintenance and ordered my client to pay that maintenance in this case should be awarded was clearly contrary to the manifest way to the evidence and with all due respect to Judge Charles Grace clearly is not based on the evidence presented and a thorough reading of the evidence in this case shows that the opposite conclusion is clearly evident. In Illinois, pursuant to the statute and case law, a maintenance is terminated or denied when the party receiving maintenance or is asking for maintenance cohabits with another person on a resident based because of the type of case they are on a case by case fact basis. Each case has its own separate facts and each case has its own little idiosyncrasies about it. Because in almost all cases, the appellant has no ability to prove what is in the appellee's mind or in the other party's mind. All we can do is look at the facts and circumstances that are presented to show what was actually in the petitioner appellee's mind when these facts and circumstances were going on. We have to look at the circumstantial evidence and the court has to look at the circumstantial evidence and reasonable inferences from those facts and the evidence that was produced. These facts and the circumstantial evidence in these types of cases play an important role in deciding whether or not a person is cohabiting on a continuous residential conjugal basis. Here, the appellant's position is that the trial court just ignored the facts that were presented and almost all of the facts that were presented and were argued came from the appellee and from the petitioner during the hearing. We can base, and this court should base and can base, and the court at the trial court level should base and deny maintenance to this petitioner on only her own testimony without even having to look at the testimony of the appellant or his witnesses. The majority of the evidence in this case came from the appellee and, just as a side note, kind of from the appellee's daughter who added a few things that turned out to be very important in this matter. I will submit in this case that when an adult individual uses the term boyfriend slash girlfriend, they are describing an attached, intimate, romantic relationship with that other individual. This case, with that said, leads us to read a case and its holdings, which would be the Klein case, and it's one of the cases that basically said, I think that was the case that basically said, is not only do you use the residing on a resident or cohabiting on a resident continuous conjugal basis to terminate maintenance, but can also be used to deny maintenance at the beginning. The Klein case also held that when the individual was asking for maintenance, admitted that she was cohabiting with another individual, but that alone should deny her the maintenance. Now, the appellee will want to argue that, well, you also have to prove the conjugal part of that, and I agree with that. We have more than just the admission of cohabitation in this case. The record shows, and the evidence was, that on two separate occasions under sworn testimony, the appellee, Mrs. Burris, described Mr. Patton of Petermore as her boyfriend. She did it in the interrogatories, and she did it again on the witness stand under sworn testimony. There were also two other occasions when she was asked boyfriend, and she basically went along with that statement, and that was asked when she, if she was in fact cohabitating with Mr. Patton. My question to her was, so basically you're cohabiting with your boyfriend, and she said yes, and I asked her basically again, did you mean you're cohabiting with your boyfriend? And she said, and the trial court remembered that there was a long pause. He described it, the trial court described it as about a 60 second pause before she gave her answer. And she again answered in the affirmative, yes. So she has described Mr. Patton as her boyfriend, and that he had been cohabiting with her. That is a difference than just describing as cohabiting, because she now has put him in the realm of an intimate, romantic individual in her life. And this is an individual that she, up to the time of the hearing in October of 16, had lived with continuously for a period of 15 months. In a, to start off, is a 30 foot camper, and then five months after that, turned into a 38 foot camper. One bedroom, three quarter bath, a kitchen, and a living room. But to go back and look at the facts, and these facts specifically, how this all came about with Mr. Patton, this was a 34 year marriage. In June of 2015, the appellant and his daughter saw the phone bill from May of that year, that there was approximately 3,000 text messages and 1,700 minutes of phone calls between Mr. Patton and Ms. Burris. Ms. Burris had known Mr. Patton for about the time, I think about two and a half years from the record. At that point in time, in the early part of July, Ms. Burris goes and hires an attorney for a dissolution proceeding, but she continues to live with Mr. Burris. She then leaves, one weekend, and he cautioned her in coming back, that was the July 17th weekend. The next weekend, she leaves again, but this time, she leaves with Mr. Patton, and they go from Murfreesboro to a hotel in West Frankfort, and spend the night there. When they come back, Mr. Patton takes Ms. Burris, and Ms. Burris back to the Burris residence, where Mr. Burris and his daughter are present. At that time, Ms. Burris acknowledges to her husband that she had sex with Mr. Patton in West Frankfort. She acknowledges that she cheated on her husband to her daughter that was there. From that point on, Ms. Burris does nothing but live with Mr. Patton in his camper in DeSoto, probably a ten mile drive from Murfreesboro, Oregon. Also in May of that year, just to show the romantic part of this relationship starting, Ms. Burris and Mr. Patton go all the way over to Marion on Ms. Burris' birthday. They have breakfast at the Cracker Barrel in Marion, and Mr. Patton gives Ms. Burris a rose. Now this is in May. Ms. Burris brings that rose back to the Merrill house, and tells her husband a lie about it. Now this was all her own testimony, this is not Mr. Burris' testimony, this is her testimony. Mr. Burris, at that point in time, doesn't know where the rose comes from, but just to show how much that rose and Mr. Patton meant to the affilee in this case, Ms. Burris, she brings that rose back to the Merrill residence. Then she leaves, and for the next 15 months, after she leaves in July, she spends the time with and at Mr. Patton's camper. So now when she has to hire a lawyer for a divorce proceeding, prior to leaving, she's had numerous text messages, phone calls, meetings with Mr. Patton before she leaves. It's also interesting to note that she wants to claim that this is just a temporary thing, but in July, which would be just one week after this whole thing takes place with her leaving, she goes to the post office and changes her address to Mr. Patton's camper. She, as soon as she comes back from the motel in Springford, and then spending the next night, they leave on a vacation together. This shows a pattern. It also shows her intent of not just being a place to live, but a permanent place for her to be, a permanent place for her to reside. This relationship, for the next 15 months, goes through all of the things that husbands and wives do when they live together. The affilee took vacations. She traveled continuously with him over the next 15 months. They chose to stay in a small camper. She does not pay any rent. She does not pay any utilities. Mr. Patton provides all of that for her. She buys groceries sometimes. Sometimes he buys groceries, and sometimes they buy groceries together. She admits that they do the laundry together sometimes, that they both enjoy cooking, that they cook together. She has family pictures in the camper. She has her clothing there in the camper. She has a key to the camper. They share responsibilities. They eat their meals together, and this is her testimony, sometimes. They go back and forth when he's working in Indiana, or when he helps people in Indiana, because he's retired, into Tennessee, to Michigan, to Indiana. It goes back and forth all the time. They spend holidays together. Now, the record indicates that she was asked about the July 4th holiday, but looking at the record, it also shows that she said she was home for Christmas in 15. She has continuously described her relationship as a boyfriend, and she said she was living with her boyfriend. Not only that, now that was basically all from her own testimony, from the witness stand. This was all from her mouth. Her daughter, who testified in the case, also described what kind of relationship her mother had with this Mr. Patton. And that was, she observed them every time they went to the courthouse in Murfreesboro for a hearing on this matter, that they walked hand-in-hand up the courthouse steps, that they kissed each other before she went into the courthouse. That not only did he say that he loved her in a text message to Mrs. Burris, Mrs. Burris responded back in a text message, I love you too. Because she borrowed the daughter's phone, she was able to see all this stuff. This was testimony without even getting into what the appellant testified to in this matter. This was all evidence from the athlete and the athlete's daughter herself, the majority of it from the athlete. Why don't you combine the... We'll have the opportunity to do that.  Ms. Brady? If it pleases the court, counsel, I'm Jessica Brady from the Roberts Law Firm for the appellee Pam Burris. I want to start with the six factors that were set forth in hearing because they haven't been clearly enunciated. In a case where we're looking at whether there is a continuous conjugal cohabitation, resident cohabitation, there are six factors that courts have looked at to determine whether that relationship rises to the level of relationship contemplated in 510C. And those are the length of the relationship, the amount of time that is spent together, the nature of the recipient's spouse and the third party's activities, the interrelation of their personal affairs, whether they vacation together and whether they spend holidays together. I want to mention another factor that isn't set forth in hearing, but it has been acknowledged in the 4th District and here in the 5th District. It's an old case, but a 1979 case. The 2nd District used to acknowledge it, but has now declined to continue to acknowledge it. And that is whether the relationship, the cohabitating relationship, has an impact on the need of the recipient's spouse for maintenance. If the 5th District still believes that is a relevant factor, I think that need is clearly demonstrated in this case. And I'll get to that in just a moment. But first, I also want to look at the case of Ingram Miller. It's a 2015 2nd District case that gives substantial clarification regarding distinguishing the difference between an intimate dating relationship and a de facto husband and wife relationship. And in Ingram Miller, they explained that the facts falling into each category must achieve a gravitas akin to marital behavior. So the absence of components that are present in a marriage is significant. Things like intended permanence, mutual commitment, shared day-to-day existence, and shared use and maintenance of material resources. There must exist a permanence sufficient for the trial court to conclude the relationship has become a substitute for a marriage. The six factors are insufficient to distinguish an intimate dating relationship from a de facto marriage if left unaccompanied by an understanding that the facts falling into each category must achieve a gravitas akin to marital behavior. And I just want to read one quote. It says, intimate dating relationships have companionship and exclusive intimacy. Whereas marriage-like relationships, while likewise having companionship and exclusive intimacy, which does not necessarily need to be sexual, but such that a former spouse does not engage in a similar relationship with a third person. So you have this companionship and exclusive intimacy in intimate dating relationships, and you also have that in a de facto marriage-like relationship, but the de facto marriage has a deeper level of commitment, intended permanence, and a less reasonably explained financial and material partnership. And that would refer to estate planning reasons or things like that. So applying these principles to the facts in this case, I'll first look to that need for material support. Pam Larris is a 55-year-old woman who is unable to work due to disc degeneration and surgical fusions in her neck and lower back. She formerly worked providing in-home health care. And for Addis, she did some office work for them, too. But because of her spine issues, she's no longer able to do either. She receives $413 a month in disability. This is not enough for a person to live on. Under her current living arrangements, she testified that her $413 a month provides just enough for her to pay her car insurance, gas, medical costs, and enough to get her personal needs like foods and toiletries. She was awarded an additional $396.61 per month in maintenance, which brings her total income to $809 a month to survive on. She testified that the reason she moved in with a third party when she left her husband to begin with was because she had no money. She could not afford to live on her own. She had to live with someone. She originally testified that she was going to live with a friend. I believe her daughter corroborated that in her testimony, saying that she thought the friend's name was Jane. But after the behavior that we'll get into of Mr. Burris, she determined that she did not feel safe there. So if the court does accept that need for maintenance is still a relevant factor, I think the evidence shows that the third party, Mr. Patton, does not pay any of her expenses. She pays them all herself. The only support he gives her is that he lets her stay on his pull-out couch in his camper, and he doesn't charge her money for living there. The prior standard of living that she had during the marriage, she testified she could afford a house, she could afford to pay her bills, and she could afford to also buy gifts for her kids and grandkids. That standard of living is not met on her $413 a month in disability. How critical do you think the issue of whether or not they're having an intimate relationship is, a sexual relationship, to your argument? I think the Supreme Court has been clear that the sexual relationship isn't required, but it is a strong component if there is evidence of one. There is no evidence of one in this case. She has testified that in every circumstance where they slept in the same space, they had separate beds, and she testified that they have never had intimacy. She stated that when she first came back to the house after they went to the hotel room that first night, Mr. Burris said, did you sleep together? And her response was, yeah, we slept. And she allowed him to believe that. I don't know why she did that. There may be some hostility that she was comfortable letting him think that. But according to her testimony, they had never been intimate, and no contrary evidence was presented. So do you think that it can be proven circumstantially, or do you believe that it's not material to the court's decision, or it was a matter of credibility? What happened in this case with respect to that issue, you think, in the court's decision? I think that it can be proven circumstantially, but I don't think it was proven circumstantially in this case. Mr. Burris could have called Mr. Gatton to testify, could have called any of the people that they go and stay with to testify, and did not. Additionally, the court stated that they did not find Mr. Burris's testimony credible with respect to the text messages, but generally they found Mrs. Burris to be credible and Mr. Burris not to be. Do we have all the text messages? I saw there were some attached as exhibits. I have the ones that were attached as exhibits. So we have all the ones that were an issue in the hearing, in the record? The most significant ones. I did not do that hearing, so I believe that they're all here. There was a different attorney on that case. How do you respond to Mr. Brooks' argument that there was an admission to a sexual relationship, and I believe that the daughter said that she admitted cheating, and that I believe Mr. Brooks just said that she slept with him and had sex. Mrs. Burris denied telling her daughter that. She said that she had no recollection of that happening. The daughter's credibility is, I think, in question because, number one, when shown the harassing text messages, she dismissed them as if they were no justification for her mother to be afraid, and she also stated on the record that she was sticking by her father through everything. So I don't believe that she's completely credible, and I also think that the court acknowledged that they didn't find her credible, and that they did find Mrs. Burris credible, and I believe that that is something that is in the judgment of the trial court. So continuing on with the six factors, the first two factors, the length of the relationship and the amount of time that they spend together. I think NRA Sunday talks about a case where the payer spouse was engaging in intimidating and harassing behaviors, and that was the impetus for the cohabitation, which in this case it was the third party coming to the recipient spouse's home. But under those circumstances, they felt that the time together, and I would say also here in the case of the length of the relationship, that those factors were artificially inflated because the reason that she, originally she testified she was going to move in with her friend. Her daughter testified that she was considering living with her friend Jane, and she stated that after he came to her friend Nancy's house and said that he was going to go get a gun and come back, that she no longer felt safe, and staying with any of her friends, she testified that she had left him in the past, and he had come to harass her at the places she stayed in the past, and so she only felt safe staying with Mr. Patton. And so I think that first factor, even though it was 15 months, it was 15 months, she stated that they had no romantic relationship of any kind when she first moved there. She stated that yes, they had communicated a lot because he had been through a divorce, she was contemplating her own divorce, and he was supporting her through that divorce. She had been friends with him for two and a half years at that point, and he was counseling her through that. We don't have any testimony about this rose. Was it a red rose? Was it a yellow rose? Who knows? All we know is that she... The friendship rose, is that what we're talking about? Such a thing exists. And perhaps that was his intention, but she has testified that at the time that she moved in with him, it was out of fear, and they did not have a romantic relationship. So the first factor of the amount of time, and the second factor, the amount of time spent together. She did testify that she lives at the camper, and so therefore they do spend a lot of time together because they both live there. But again, number one, that's because she had to move there because of the harassing and threatening behavior of the payer's spouse, Mr. Veras. And she also stated that she spends a lot of time over at her children's house, her grandchildren's house, sometimes two to three times a week, sometimes staying there a month to a month and a half. So factors one and two are both, I would argue, artificially inflated based on the harassment and the necessity created by the threats of Mr. Veras. The third factor, the nature of the activities engaged in. She testified that they eat different times. Sometimes they eat together. They do their laundry separately unless if she's doing her laundry and she sees he just has a couple things, she'll throw them in. This does not equal doing each other's laundry, and there was never testimony that they do each other's laundry. The only items that significant, most of the cases I've looked at where the belongings of the recipient's spouse are located or the third party staying with the recipient's spouse. The only belongings she has at that house are her clothes and some pictures of her grandkids. That's all that was testified to. She has not set up shop in his camper. She specifically stated she has not purchased anything for that residence. The fourth factor is the interrelation of their personal affairs. She said she uses her $413 a month to pay her personal living expenses. Any funds that Mr. Patton provided before she was receiving disability payments when she had zero were in the form of a loan. She paid him back when she got her settlement for disability. There's no shared bank accounts. They haven't applied property together. They haven't listed each other as beneficiaries on any kind of documents. He's rarely involved in her time with her children. There's not evidence that their personal affairs have become interrelated such that this commitment has risen to the level of a marriage. The fifth factor, when they vacation together, she testified that every single time they've been out of town together they've stayed in different beds, different rooms, sometimes different buildings, sometimes him with his brother, her with the sister, and that the reason she accompanies him on these trips is because she is fearful for her life because of the threats of Mr. Lewis. The sixth factor, whether they spend holidays together, clearly does not support a finding of a de facto husband-wife relationship. On one of these work trips, 4th of July occurred, so they were together, I believe, on this one, 4th of July, and the record's not entirely clear whether they spent a Thanksgiving together. That might have been before the separation because it's my understanding that the Thanksgiving that happened after the separation, she was actually at Mr. Burris' home cooking for the family and even went and Mr. Burris was not supposed to be there, but he was, requested that she come into the bedroom and talk to him, and she did, with her children there, obviously. So looking at holidays, every holiday over a year and a half period except for one 4th of July that occurred during one of these working safety trips and possibly a Thanksgiving were spent separate. The final factor that is considered in the Moore case is whether the totality of these circumstances, so the facts under each factor when weighed, have a gravitas that makes the relationship something more than an intimate dating relationship. I don't believe it's clear here that even an intimate dating relationship exists. We have no physical intimacy testified to. We have testimony that she rebutted, there's the implication that this is a romantic relationship for Mr. Burris, but she rebutted every point she made. Time has expired. I appreciate your testimony, I mean your argument. You have the opportunity to rebut at this time, Ms. Berg. Ms. Berg. The court specifically noted that evidence was unrebutted by the respondent and the court found the petitioner and her testimony believable and found the respondent lacked credibility and particularly regarding threats, harassment, photos, and texts. There were three text messages, yes, there were, Your Honor. But if you look at the conduct of Mrs. Burris prior to that, this had been a 34-year marriage. He had discovered 3,000 text messages in 1,700 minutes on the phone. A rose came from somewhere. Now this isn't going on Mr. Patton's brain. I got caught on the rose a lot. Well, I think Mrs. Burris testified that the rose was dead when she got it back to the house. I mean we can presume this was a very acrimonious dissolution from what little we have here on the actual breakdown.  But the one Latin phrase that I learned in college in my Elijah class was post hoc ergo proctor hoc, which is after this, because of this. And I think that's what you have. If you look at the facts and how they were in this case, she left the second time. There wasn't a mention of the gun at this point in time because if you look at her testimony, that was the second time when he went over to Nancy's house. That was after she had already gone to West Frankfurt, spent the night with him in the hotel at West Frankfurt, had come back, spent the night in the camper with Mr. Patton, and that was also after she had seen Mr. Burris at the house. Well, regardless of the timing, the gun threat would be a very serious threat, correct? Correct. It wouldn't be a very serious threat. He said he didn't make it. That's why I read that. I understand. Whatever the case may be. I think if you look at that, though, that is she's trying to justify her moving in with Mr. Patton. At that point in time, she was in the process of changing her address to his camper. Those text messages were sent after she had already moved out and spent the night at the hotel and the camper with Mr. Patton. Those text messages were sent afterwards. And she had already moved out, she had already left and spent the night in the hotel in West Frankfurt and with Mr. Patton when he went over to the house. And in his testimony, he didn't say anything about a gun. She described it, yes, she did. But that was after she had already made a decision. Regardless, I'm just, what do you make of the fact that the court did not find his testimony credible? I find that the court made an improper ruling is what I would say. Because it was justified or what? I don't believe it was justified. I don't believe, if you look at his testimony, his testimony was clear, succinct as to what happened and what happened. He admitted making those text messages. He said he was distraught. It was a 34-year marriage, three kids, everything up to that point that he knew was going okay. They had their problems, but he was distraught at that point in time. And if you can look at it, she was in another state when he sent those messages. Because she said as soon as she got back and went to Nancy's house, then she left on a vacation with him to, I think it was Michigan at that point in time. When she came back to the house and talked, there was something made about whether she had admitted having sex with Mr. Patton. These were the questions that I asked. And you stayed Sunday night at the hotel with Mr. Patton, correct? No, sir. You checked out of the motel. Then where did you go? Mr. Patton's. You went back to Mr. Patton's residence. Yes. Which was a camper located in DeSoto, I asked her. Yes. And I asked her, when Mr. Burris questioned you about whether you were sleeping with Mr. Patton, you knew exactly what he meant, whether you were having sex with him, correct? And she said yes. And you told him yes, you were sleeping with him, correct? Yes. I don't believe there's any at all, any muddy water as to whether or not she told him she was sleeping with him, that she slept with Mr. Patton. One of the cases, and I think it was Sappington from the Supreme Court, indicated how difficult it is to prove a sexual relationship because that's not something people do out in the- You can finish that. But they do out in public. Oh. Thank you, Your Honor. Okay. Thank you both for your arguments. And we will take the matter under advisement and render a ruling in due course.